UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMANTHA HEATHER B., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security,[1] <br><br> Defendant. | Case No. 2:19-cv-04917-KES <br><br> MEMORANDUM OPINION AND ORDER |

## I.

## PROCEDURAL BACKGROUND

Plaintiff Samantha Heather B. ("Plaintiff") originally applied for Social Security disability benefits on June 30, 2010, when she was 31 years old. Administrative Record ("AR") 608. She was found disabled as of September 14, 2008, due to psychiatric issues. AR 470. At that time, she lacked "the ability to perform even unskilled work." AR 471. She had marked impairment in her ability to sustain concentration, persistence and pace, and in several other areas of

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

1

functioning. AR 470-71, 1272-78.

Following review, Plaintiff's disability was determined to have ended as of July 1, 2015. AR 467. Plaintiff now appeals the determination that she is no longer disabled and no longer eligible for Social Security Disability benefits ("SSDI").

On April 19, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE"). AR 422-51. On June 12, 2018, the ALJ issued an unfavorable decision, determining that Plaintiff's disability had ended as of July 1, 2015. AR 19-35. The ALJ found that Plaintiff suffered from the medically determinable severe impairment of bipolar disorder. AR 21. Despite this impairment, the ALJ found evidence of medical improvement since 2011, such that from July 2015 to April 2018, Plaintiff was only mildly impaired "with regard to concentrating, persisting or maintaining pace" and no more than moderately impaired in other areas. AR 21-22. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "medium" work with a limitation to "simple, repetitive tasks with occasional interaction with coworkers and supervisors." AR 22. Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could work as a hand packer, vegetable packer, or industrial cleaner. AR 28-29. The ALJ concluded that Plaintiff was no longer disabled as of July 20, 2015. AR 29.

## II.

## ISSUES PRESENTED

This appeal presents the sole issue of whether the ALJ erred "finding medical improvement related to [Plaintiff's] ability to work." (Dkt. 20, Joint Stipulation ["JS"] at 7.) Plaintiff divides her briefing into the following four sub-issues:

<u>Sub-Issue One</u>: Whether the ALJ erred by finding that Plaintiff's daily

2

activities evidence functional abilities inconsistent with continuing disability. (Id. at 12.)

Sub-Issue Two: Whether the ALJ erred by giving "little weight" to the opinion of treating psychiatrist, Dr. Woods. (Id. at 8-10, citing AR 27.)

Sub-Issue Three: Whether the ALJ erred by giving "great weight" to the opinions of consulting psychiatrist Dr. Ritvo and non-examining state agency psychiatrists Drs. Amado and Gold. (Id. at 7-8.)

Sub-Issue Four: Whether there is substantial evidence from after 2015 supporting the ALJ's finding of non-disability. (Id. at 8.)

## III.

## DISCUSSION

### A. SUB-ISSUE One: Plaintiff's Daily Activities.

#### 1. Summary of Relevant Evidence.

The AR contains four major sources of evidence about Plaintiff's daily activities: (1) a Function Report completed by Plaintiff (AR 654-61); (2) a Function Report completed by Plaintiff's boyfriend, B. B., on December 30, 2014 (AR 645-53); (3) Plaintiff's hearing testimony in April 2018 (AR 424-46); and (4) therapy notes from 2014-2018 discussing Plaintiff's activities.

a. Plaintiff's Function Report.

Plaintiff reported working part-time, caring for her dogs, preparing meals, doing laundry, cleaning the house, driving, shopping, handling her own funds, and going to medical appointments. AR 655-57. She had a "hard time" remembering to do things, including bathing. AR 655. She reported that she liked to stay home and handled stress "horribly." AR 660. She was taking one medication, Abilify. AR 661.

b. B. B.'s Function Report.

Mr. B. reported that he and Plaintiff lived together in an apartment and did "most everything together." AR 645. Plaintiff's daily activities included going to

work, using Facebook, feeding and walking their dogs, watching TV, and personal care. AR 646, 649. She prepared meals once or twice a day, spending about 20 minutes each day on food preparation. AR 647. She needed reminders and encouragement to finish household chores and pay bills. AR 647-48. She could drive and went shopping weekly. AR 648. She talked to family members on the phone multiple times every day. AR 649. He observed that she had trouble processing information and following written instructions. AR 650. She handled stress "very very poorly," but she did not exhibit unusual behaviors. AR 651.

For work, Mr. B. "runs his own website." AR 439.

### c. Plaintiff's Hearing Testimony.

At the time of the April 2018 hearing, Plaintiff lived occasionally with her mom and mostly with her boyfriend. AR 435. Plaintiff had improved in 2011 and started working part-time, but stopped in 2016 due to anxiety and stress. AR 426. Plaintiff worked at Corner Bakery for about four or five years, although she made a lot of mistakes and struggled at work until they fired her.[2] AR 429-30, 439. She received unemployment benefits. AR 441. In 2015, she was working at McDonalds part-time. AR 431. She estimated that she worked "three, four days a week." Id. She also estimated that she missed work "one to two times a week" because she could not get herself out of bed. AR 436. According to Plaintiff, the manager at McDonalds frequently sent her home early when she could not perform her job duties, such as starting the timers or pulling food out of the fryers on time. AR 432. She would get "stressed out" when asked to do "multiple things at once" and even over simple things AR 434. Eventually, she quit her McDonalds job. AR 439.

Plaintiff testified that she had trouble finishing household chores. AR 435.

---

[2] In March 2014, Dr. Kolpe determined that Plaintiff was "doing much better" and could resume working at Corner Bakery with limited hours. AR 255.

4

She had crying spells a "couple times a day." AR 435. Nearly every day, she had trouble getting out of bed and felt suicidal. Id. She had attempted suicide in 2002. AR 437. She only cooked "easy stuff," like TV dinners and sandwiches, or she helped others cook. AR 438, 444. She kept in touch with two friends via Facebook. AR 438.

Plaintiff thought that her condition had worsened since 2011. AR 439. She testified that she heard voices and talked to the voices in her head. AR 441. Her doctors were actively adjusting her medications. AR 442-43.

### d. Chronology of Therapy Notes.

- 1/14/14: Plaintiff reported being "more compliant" with her meds, "feeling good, sleeping well" while working part-time at both Corner Bakery and McDonalds. AR 263.
- 2/11/14: Plaintiff was temporarily homeless and living in her car or a motel with her boyfriend while they waited for a low-income rental to become available in mid-month. AR 268.
- 2/25/14: Plaintiff found another room to rent but requested a 1-month leave of absence from Corner Bakery to relieve stress. AR 270.
- 3/27/14: Plaintiff reported "doing well" on her medications, and she was ready to return to work at Corner Bakery. AR 273.
- 5/20/14: Plaintiff was angry that one of her doctors reported physical abuse by her boyfriend, prompting a call from a social worker. AR 279.
- 6/16/14: Plaintiff was working 30 hours/week and planning to leave her abusive boyfriend who treated her "like a maid." AR 284.
- 8/6/14: Plaintiff went to an Angels baseball game. AR 288.
- 8/20/14: Plaintiff acquired a new puppy. AR 290.
- 10/3/14: Plaintiff reported juggling her two-job schedule "quite well" and feeling less anxiety after her mom's successful breast cancer surgery. AR 295.

5

- 10/15/14: Plaintiff missed three weeks of therapy and took a 1-week vacation to visit her boyfriend's family in Texas and Oklahoma. AR 299, 904.
- 1/21/15: Plaintiff reported an "OK" mood but continuing "trouble with her boyfriend" and feeling "more anxious, depressed." AR 308-09.
- 2/20/15: Plaintiff reported running out of medication after a gap in treatment. AR 315. She was working 5 days/week at McDonalds, reported "adequate" energy, had no thoughts of harming herself, and had not heard voices for more than five years. Id.
- 3/27/15: Plaintiff rated her depression as 2-3/10 when not around her boyfriend with "good" energy and no psychotic symptoms. AR 320.
- 5/15/15: Plaintiff described her McDonalds job: "She likes the job very much now, but was really anxious at first." AR 324. Her boyfriend "maxed out her credits cards" and then filed for bankruptcy. Id. She "still has some bad days, but they are limited." AR 325.
- 5/29/15: Plaintiff started working for Uber, driving at night after her shift at McDonalds. AR 329. Her car, however, was being repossessed due to her boyfriend's debts. AR 330. She was trying to find a place to live that would accept all 3 of her dogs, and she had received offers of assistance from "church friends." Id.
- 6/30/15: Plaintiff was making more money than her boyfriend, and his bills exceeded hers. AR 334. At the time, she was earning $700/month at McDonalds and receiving $840/month as SSDI benefits. AR 336.
- 7/20/15: Per the ALJ, the date Plaintiff was no longer disabled. AR 29.
- 10/9/15: Plaintiff agreed to save some money by renting a smaller storage unit and discussed budgeting. AR 350.
- 10/16/15: Plaintiff cut back her hours at McDonalds to 20 hours/week because "of fear of losing disability" by earning too much money. AR 353.

- 11/27/15: Other than disputes with her new landlady, Plaintiff reported that she "feels good" and "the recent increase in medication has helped." AR 358.
- 12/11/15: Plaintiff's mother told her therapist that Plaintiff went to New York with her boyfriend and received a settlement after a car accident. AR 362. In response to a wellness-check call, Plaintiff reported she was "doing great" and did not need medication refills. Id.
- 1/15/16: Plaintiff reported doing well at work as a crew trainer and being in line for a manager promotion. AR 363. She travelled to Las Vegas with her boyfriend to visit her father. Id.
- 3/2/16: Plaintiff reported feeling "more anxious and depressed." AR 375. She cut back on showering because the landlady complained about their water usage. Id.
- 3/4/16: Plaintiff sought assistance in retaining her SSDI benefits, and her case manager made sure all 2015 and 2016 treating records were sent. AR 376. The counsellor declined to complete a questionnaire, because "due to the content of the medical records, … a questionnaire would not help client's case." Id.
- 3/11/16: Plaintiff was "overwhelmed" by the thought of losing her SSDI benefits. AR 380.
- 3/18/16: Plaintiff endorsed the efficacy of her medications. AR 382. She acquired another dog. AR 383. She complained of panic attacks at work when taking drive-through orders, but her co-workers helped her. Id. She discussed keeping a food diary. AR 388.
- 5/23/16: Plaintiff reported that her landlord, who suffers from dementia, tried to kill her by choking her, but she did not file a police report. AR 395.
- 7/8/16 – 7/29/16: Plaintiff reported a "depressed mood" after missing therapy sessions and stopping her medications. AR 397, 401. After

resuming her medication, she "feels much better." AR 401. She went to Disneyland with her boyfriend. Id.

- August 2016: Plaintiff stopped working. AR 412.
- 12/2/16: Plaintiff reported that she was travelling out of town, doing "fine," and in "full medication compliance." AR 407.
- 2/6/17: Plaintiff was in Myrtle Beach with her boyfriend. AR 413. She observed an "improvement in symptoms" which she attributed to "not working, and no stress." Id.
- 2/2/17: Plaintiff was doing "okay," stopping her medication, and taking a 2-3 month trip across the country with her boyfriend. AR 411.
- 5/3/17: Plaintiff described travelling around the country and to Europe with her dogs and boyfriend, who had a sales job, for the past 9 months. AR 414. Plaintiff was off all her medications for more than 6 months. AR 416. She returned to live with her mother for more "structure and stability." AR 414.
- 5/4/17 – 5/8/17: Plaintiff reported feeling very "low" as a result of being off all medications and new abuse by her boyfriend. AR 37. Plaintiff began looking for new rental housing. AR 39.
- 8/14/17: Plaintiff reported that she was not improving on Latuda, so her medication was changed to Lamictal. AR 41.
- 9/18/17: Plaintiff reported "feeling better" on her second week of Lamictal. AR 45.
- 11/6/17: Plaintiff reported that 10 days/month she does not get out of bed to shower or dress. AR 48. She reported suicidal ideations "at least half the days out of the month." Id. Per Dr. Woods, Plaintiff was "not doing as well as she did a couple of years ago," perhaps due to "prolonged non compliance," but "Hopefully she will some day get back to work at l[e]ast part time." AR 49-50.
- 2/7/18: Plaintiff reported having "real thoughts" about suicide but was able

8

to drive herself home.  AR 59.  She also reported "good" mood and energy.  She was working 10 hours/week at a cleaning service and "enjoys it."  AR 60; AR 61 ("patient is doing much better since arriving at this dose of Lamictal").

## 2. Summary of the ALJ's Analysis.

The ALJ summarized the Function Reports, hearing testimony, and treating records.  AR 23-27.  The ALJ noted that they generally showed improvement, except for periods of medical non-compliance.  The ALJ cited Plaintiff's statements that she had scaled back on work in October 2015 to avoid losing benefits rather than because of stress or performance issues.  AR 25 (referring to AR 353).  The ALJ cited Plaintiff's ability to drive, use Facebook, work at McDonalds, take care of dogs, do household chores, manage her own finances, and prepare meals as evidence of improvement that was inconsistent with Plaintiff's claim of total disability.  AR 27.  The ALJ also cited medical opinion evidence that Plaintiff's mental illness resulted in only mild or moderate functional limitations, consistent with her reported activities.  Id.

## 3. Substantial Evidence Supports the ALJ's Reasoning.

Plaintiff contends that the ALJ erred in (1) finding Plaintiff's activities inconsistent with her testimony and (2) finding that they reflected "significant and sustained increase in functioning from the time she was originally found disabled." (JS at 21.)  The findings and decision of the Social Security Administration must be upheld if they are free from legal error and supported by substantial evidence based on the record as a whole.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); see also 42 U.S.C. § 405(g).

First, the ALJ did not err in finding inconsistencies.  In April 2018, Plaintiff testified that she felt suicidal everyday (AR 436), but none of the treating records summarized above reflect her reporting suicidal ideations before late 2017, after six months off all medications.  AR 48; compare AR 263, 273, 295, 315, 358, 362,

9

401, 407, 411. Plaintiff testified that she was unable to work successfully at McDonalds because of symptoms of her mental illness (AR 426, 431-34), but her therapy records show that she worked there successfully for years, became a crew trainer, was considered for a promotion to manger, and only cut back her hours to avoid making too much money to qualify for SSDI benefits. AR 315, 324, 353, 363. She was not fired; she quit to travel with her boyfriend. AR 407, 412-13. Plaintiff testified that she had a hard time doing simple work like household chores because of drifting attention (AR 444-45), but when she was motivated to do fun or necessary things (like driving for Uber, taking care of her dogs, going to Disneyland or a baseball game, finding new rental housing, and travelling with her boyfriend), she was able to do so.

Second, the ALJ also did not err in finding that Plaintiff's level of daily activities reflected functional improvement inconsistent with continuing disability. Plaintiff had enough mental wherewithal to take care of her housing situation, declare bankruptcy, obtain a legal settlement after a car accident, rent a storage unit, and seek help with her SSDI application. AR 268, 270, 324, 350, 362, 376. She worked at McDonalds until she reduced her hours to avoid making too much money to qualify for benefits and eventually quit to travel with her boyfriend. She could take care of her dogs' daily needs and even acquired a new dog. After her mental health declined in early 2017 due to medical non-compliance and she resumed treatment in late 2017, she was able to obtain part-time work again by February 2018. AR 60. These activities support the ALJ's finding that Plaintiff has the mental ability to perform fulltime work consistent with the stated RFC, if sufficiently motivated to do so.

**B. SUB-ISSUE TWO: Dr. Woods.**

**1. Summary of the Relevant Law.**

Three types of physicians may offer opinions in Social Security cases: those who treated the plaintiff, those who examined but did not treat the plaintiff, and

those who did neither. See 20 C.F.R. § 404.1527(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended). A treating physician's opinion is generally entitled to more weight than an examining physician's opinion, which is generally entitled to more weight than a nonexamining physician's. See Lester, 81 F.3d at 830. When a treating or examining physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing reasons." Carmickle v. Comm'r of SSA, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). Where such an opinion is contradicted, the ALJ may reject it for "specific and legitimate reasons that are supported by substantial evidence in the record." Id.; see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).

### 2. Summary of Medical Evidence from Dr. Woods.

Dr. Celia Woods works at Ventura County Behavioral Health ("VCBH"). Plaintiff testified that she started seeing Dr. Woods about a year before the hearing (i.e., 2017), and that she saw her about once a month until two months before the April 2018 hearing, at which time Plaintiff started seeing "Dr. S." AR 443-44; AR 64 (by April 2018, Plaintiff was seeing Dr. Shmaryan). In December 2016, Dr. Woods stated that she had not seen Plaintiff since June 2016. AR 407.

In November 2017, Dr. Woods wrote a letter opining that Plaintiff had spent much of 2017 depressed and off medication, referring to the months when Plaintiff was travelling with her boyfriend. AR 1319. Dr. Woods repeated Plaintiff's reports that 10 days each month, Plaintiff did not get out of bed. Id. While Dr. Woods had seen that Plaintiff was back on medication and doing "a little better," Dr. Woods believed that she was not "capable of gainful employment." AR 1319.

### 3. Summary of the ALJ's Analysis.

The ALJ gave Dr. Woods's opinion letter little weight, reasoning that the degree of functional limitation asserted by Dr. Woods was inconsistent with repeated notes of improvement by other treating sources and the sporadic, non-urgent nature of Plaintiff's mental health treatment. AR 27. The ALJ found that

the extreme functional limitations reported by Plaintiff to Dr. Woods and then repeated by Dr. Woods in the letter (such as spending 10 days/month in bed) were likely caused by medical non-compliance, and that non-compliance was "contraindicative of serious symptoms that would be expected to motivate the claimant to adhere to medical recommendations." Id. The ALJ further noted that the letter was inconsistent with Dr. Woods's own treating notes/clinical findings, which reflected progress and only mild functional limitations when Plaintiff was medically compliant. Id.

### 4. Substantial Evidence Supports the ALJ's Reasoning.

Per the treating records summarized above, at the beginning of 2016, Plaintiff was working successfully at McDonalds. AR 363. In mid-2016, VCBH did not believe that her medical records supported continued receipt of SSDI benefits. AR 376. In August 2016, Plaintiff chose to quit her job and travel with her boyfriend and dogs. AR 411-14. She continued to do this until May 2017, when she returned home feeling depressed, having been off all medication for more than six months. AR 37. After she resumed taking medication and found the correct dosage, she felt better. AR 41, 45. By February 2018, she had obtained part-time employment again. AR 60.

This evidence supports the ALJ's conclusion that Dr. Woods's opinion letter represented a snapshot in time when Plaintiff's condition was poor due to prolonged medical non-compliance. Dr. Woods November 2017 opinion that Plaintiff was unable to work is belied by the fact that Plaintiff was working by February 2018. Thus, the ALJ gave specific and legitimate reasons supported by the record for discounting Dr. Woods's opinion letter.

## C. SUB-ISSUE THREE: Drs. Ritvo, Amado, and Gold.

### 1. Summary of Medical Opinions.

#### a. Dr. Ritvo.

Dr. Edward Ritvo completed a psychiatric evaluation of Plaintiff on

February 25, 2015.  AR 723-27.  He reviewed a December 2010 evaluation of Plaintiff diagnosing her as suffering from bipolar disorder with a Global Assessment of Functioning ("GAF") score of 55.  AR 723.  He reviewed Plaintiff's history of mental illness with her and deemed her a "reliable historian."  Id. Plaintiff told Dr. Ritvo that she had strong mood swings and difficulty concentrating and had been treated since 2002 by Dr. Kolpe after she was hospitalized with suicidal ideations.  AR 723-24.  Dr. Kolpe saw her once a month and prescribed Abilify, which Plaintiff found "quite helpful."  AR 723.

At the time of the evaluation, she denied suicidal ideation and psychosis.  Id. She was working part-time at McDonalds and living in an apartment with her boyfriend.  AR 725.  She reported that she could drive, go out alone, manage her "basic needs," and handle her own money.  Id.  She displayed coherent thinking with appropriate affect and a cooperative attitude throughout the evaluation.  Id.

Dr. Ritvo administered a series of tests for cognition and concentration.  AR 726.  Based on these, he concluded that Plaintiff "appears to be of at least average intelligence," could follow a conversation, and had "intact" insight and judgment. Id.  He diagnosed her as suffering from bipolar disorder with a GAF score of 65, consistent with "mild" symptoms.  AR 726-27.  Most relevant here, he opined that she was only "mildly" impaired in her ability to "maintain persistence and pace in a normal workplace setting."  AR 727.

### b. Dr. Amado.

In March 2015, Dr. H. Amado, a non-examining psychiatrist, completed forms consistent with the "psychiatric review technique" required by the regulations.  AR 778-88.  Dr. Amado identified the assessment as covering "9/17/2014 to 3/30/2015."  AR 778.  Dr. Amado found that Plaintiff suffered from "affective disorders" that qualified as severe but did not meet a listing.  Id. Specifically, Plaintiff had "bipolar d/o [disorder], chronic per CE [consultative examiner] report," demonstrating a review of Dr. Ritvo's report.  AR 781.

Dr. Amado opined that Plaintiff had no limitations on her activities of daily living, mild difficulties with social functioning, and moderate difficulties maintaining concentration, persistence, or pace.  AR 786.  Dr. Amado summed up the evaluation as follows:

> Great weight is accorded the psych CE of 2/15 [i.e., Dr. Ritvo's report] in the absence of current MER [medical evidence of record] from psych TP [treating physician] (see remarks in V21 document).[3] At CPD [comparison point decision date[4]] claimant needed reminders to take care of her personal grooming and to take her meds, with problems following instructions and completing tasks.  She appears more functional now, able to work for more than halftime at a local fast-food franchise.  Boyfriend mentions that claimant still has problems processing information and that she does not seem to think as other people do in handling everyday problems, but overall she seems more independent in her adaptive skills, drives and manages her own finances (at the CPD five years ago she did not handle her own money, did not drive, generally depended on other people to tell her what to do).  Agree with DEA [disability examiner authority] that overall it seems SMI[5] has transpired and that claimant should be able to sustain simple tasks on a consistent basis.  Claim continuance on psych grounds does not seem to apply.

---

[3] The parties do not identify this "V21 document" or make any arguments about it.  The Court therefore does not address it.

[4] The CPD date is the date of the claimant's most recent favorable decision.  See POMS DI 81010.215.  Here, the CPD date is January 3, 2011.  AR 21, 972.

[5] It is unclear whether "SMI" refers to "serious mental illness" or "substantial/significant medical improvement."  The parties do not discuss this issue, and the Court therefore does not address it.

AR 788.

    c. Dr. Gold.

In November 2015, Dr. Sidney Gold completed a serious of forms similar to those completed by Dr. Amado. AR 957-70. Dr. Gold assessed Plaintiff as suffering from "depressive disorder." AR 960. He rated her functional limitations the same as Dr. Amado. AR 965. He opined "based on evidence in file" that Plaintiff was "capable of SRT [simple repetitive tasks] and displays no SMI [serious mental illness]." AR 967. The "evidence in file" that pre-dates November 2015 includes function reports from Plaintiff and her boyfriend, Dr. Ritvo's report, and medical treatment records about headaches, a mammogram, diabetes, and a sore throat. AR 973-74 (summarizing evidence).

Dr. Gold also provided opinions as to Plaintiff's mental RFC. AR 968-69. He concluded, "Claimant retains the ability to understand, remember, and carry out simple work-related tasks, and has no significant limitations in the ability to sustain concentration/persistence/pace, relate to others, or otherwise adapt to the requirements of the normal workplace." AR 970.

## 2. Summary of the ALJ's Analysis.

The ALJ gave "great weight" to the opinions of Drs. Ritvo, Gold, and Amado. AR 27. The ALJ based this on "supportability with medical documentation, consistent with the records and area of specialization (SSR 96-6p), as well as [Plaintiff's] testimony at the hearing." AR 27. The ALJ further explained his reasoning, as follows:

> The cumulative record reflects that despite dealing with severe stressors, including bankruptcy and homelessness attributed to spendthrift behavior of her boyfriend, the claimant continued to function adequately, with treating and examining sources, consistently reporting the claimant to be alert, fully oriented, with no motor concerns, linear thinking, age-appropriate attention, affect,

judgment and insight, normal speech, appropriate appearance, no
perceptual deficits, intact concentration and memory, and cooperative
attitude. The record in its entirety supports the established [RFC].

AR 27-28.

### 3. Substantial Evidence Supports the ALJ's Reasoning.

Plaintiff contends that the ALJ erred by giving "great weight" to these doctors' opinions because they did not view Plaintiff's treating records from VCBH. (JS at 8.) These three doctors evaluated Plaintiff in 2015, and records from VCBH had not been received by the time of the April 2018 hearing. AR 427-28. Per counsel, they had only been requested one month earlier. Id.

The reasons given by the ALJ are supported by substantial evidence. All three doctors found only mild to moderate functional limitations, findings consistent with Plaintiff's activities at the time, which included working part-time, living with her boyfriend, managing her own finances, and caring for her dogs. Plaintiff's briefing identifies nothing in the VCBH records that would have changed these doctors' 2015 assessments.

Plaintiff suggests that Dr. Ritvo's opinion does not support the ALJ's RFC, because Dr. Ritvo "did not comment on her ability to maintain concentration." (JS at 8, citing AR 727.) It is true that Dr. Ritvo referred to "persistence" and "pace," but not "concentration." AR 727. Plaintiff, however, fails to explain why the opinions of Drs. Gold and Amado (which do expressly address concentration, per AR 970, 786) would not render any error harmless.

### D. SUB-ISSUE FOUR: Post-2015 Evidence.

Plaintiff argues that the opinions of Drs. Ritvo, Gold, and Amado are not substantial evidence of Plaintiff's condition after 2015. (JS at 8.) Plaintiff further argues that since her condition got worse after 2015, the ALJ erred by relying on Drs. Ritvo, Gold, and Amado to find Plaintiff "not disabled" from January 2016 through the date of the April 2018 decision. (Id.)

16

Per the therapy records summarized above (and summarized by the ALJ at AR 25), Plaintiff was doing well at the beginning of 2016. See, e.g., AR 363. Her mental health deteriorated after she chose to (1) cut back on her work hours to avoid making too much money to qualify for SSDI, and (2) quit her job entirely to travel around the country with her boyfriend, during which time she stopped taking medication. AR 353, 411, 416. In these circumstances, substantial evidence supports the determination that any deterioration was caused by voluntary medical non-compliance.

Once Plaintiff returned to treatment, within less than six months she improved to the point where she again obtained part-time employment. AR 60-61. Thus, substantial evidence supports the ALJ's finding that even in 2016-2018, Plaintiff had functional abilities consistent with the opinions of Drs. Ritvo, Gold, and Amado when she was medically compliant.

## IV.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED: March 18, 2020

_____
KAREN E. SCOTT
United States Magistrate Judge